593 A.2d 925

**MORRISONS COVE HOME et al., Petitioners,**

v.

**DEPARTMENT OF HEALTH; Nittany Manor Associates Limited Partnership; and the Rehabilitation Hospital of Altoona, Respondents.**

**REHABILITATION HOSPITAL OF ALTOONA, Petitioner,**

v.

**DEPARTMENT OF HEALTH and Nittany Manor Associates Limited Partnership, Respondents.**

**MORRISONS COVE HOMES et al., Petitioners,**

v.

**DEPARTMENT OF HEALTH, Respondent.**

**REHABILITATION HOSPITAL OF ALTOONA, Petitioner,**

v.

**DEPARTMENT OF HEALTH, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Argued March 7, 1991.

Decided June 17, 1991.

Reargument Denied Aug. 7, 1991.

470

472

Gerald Gornish, Philadelphia, for petitioners, Morrisons Cove Home et al.

Christine Garvey DeLuce, Asst. Counsel, for respondent, Dept. of Health.

Mark Stadler, Pittsburgh, for respondent, Nittany Manor Associates.

Before CRAIG, President Judge, PALLADINO, J., and BARRY, Senior Judge.

PALLADINO, Judge.

Presently before this court are four appeals. Morrisons Cove Home et al.[1] (Homes) appeal an order of the State Health Facilities Hearing Board (Board) which affirmed a Department of Health (Department) decision, approving a certificate of need (CON) for Nittany Manor Associates (Nittany).[2] The Rehabilitation Hospital of Altoona (Rehab)[3] also appeals the Board's order affirming the Department's decision to approve the CON. Homes and Rehab separately appeal the Board's subsequent order denying reconsideration. This court consolidated the four appeals, which we will address herein.

Nittany filed a letter of intent with the Department to construct and operate a 120 bed nursing home in Blair county in close proximity to Altoona Hospital.[4] The Department notified Nittany that, before proceeding with the project, it must meet the criterion for approval of a CON set forth in Section 707 of the Health Care Facilities Act (Act)[5] and 28 Pa.Code § 401.4.

Section 707 of the Act provides in pertinent part:

1. These petitioners include five nursing homes and one intensive rehabilitation care provider currently operating in Blair county.

2. Nittany is a proposed partnership of Grane Associates and Lexington I, which seeks to operate a nursing home in Blair county. Grane Associates operates for-profit nursing homes outside Blair county. Lexington I is a wholly-owned subsidiary of Central Pennsylvania Health Services Corporation, which is the parent company of Altoona Hospital.

3. Rehab provides intensive rehabilitation services in Blair county.

4. Of the 120 beds, 60 are designated for intermediate care and 60 are designated for skilled care.

5. Act of July 19, 1979, P.L. 130, *as amended,* 35 P.S. § 448.707.

(a) An application for a [CON] shall be recommended, approved, and issued when the application substantially meets the requirements listed below provided that each decision ... shall be consistent with the State health plan [SHP [6]]:

> (1) The relationship of the application with the applicable health systems plan [7] and annual implementation plan has been considered.

> . . . .

> (3) There is a need by the population served or to be served by the services.

> . . . .

> (5) The service or facility is economically feasible, considering anticipated volume of care, the capability of

6. SHP is defined at 28 Pa.Code § 401.2 as follows:

*A statement of goals for the State health care system based on the Health Systems Plans* for the state and approved by the governor prepared triennially, reviewed annually and revised as necessary. *It describes* the institutional health services needed to provide for the well-being of persons receiving care within the state, the number and type of resources, including facilities, personnel, major medical equipment, and other resources, including financial resources, required to meet the goals of the plan, states the extent to which existing health care facilities are in need of modernization, conversion to other uses, or closure and *the extent to which new health care facilities need to be constructed* or acquired. (Emphasis added.)

A complete copy of the SHP is not part of the certified record. However, the parties have supplied this court with pertinent portions of the SHP in the Joint Reproduced Record at 268a–302a, which include Chapter 39 of the 1982 SHP, the May 1986 Amendment to the SHP, the December 1986 Amendment to the SHP, and CON Memorandum 89–24. When referring to a section of the SHP we are constrained to cite to the Joint Reproduced Record (JRR). Otherwise, we will follow our standard practice of referring only to the certified record.

7. A Health Systems Plan is a statement of "health service area goals and strategies for achieving the goals" which is approved by the Health Systems Agency (HSA), "[a]n entity which has been conditionally or fully designated under the National Health Planning and Resources Development Act of 1974 (42 U.S.C.A. §§ 300k–300n–6)." 28 Pa.Code § 401–2.

the service area to meet reasonable charges for the service or facility and the availability of financing. (6) The proposed service or facility as [sic] financially feasible both on an intermediate and long term basis and the impact on cost of and charges for providing services by the applicant is appropriate.

. . . .

(19) The contribution of the proposed new institutional health service in meeting the health related needs of members of medically underserved groups has been considered in written findings.

These same criteria are enumerated in 28 Pa.Code § 401.-4(a)(1), (3), (5), (6) and (19) in almost identical language.

Nittany filed an application for a CON on April 1, 1988. The application included: calculations intended to demonstrate the need for 120 beds in Blair county; a proposed patient mix of 30% Medical Assistance, 30% Medicare, and 40% private pay; a feasibility study; and a statement of intent to provide "a full range of rehabilitation services designed to meet the physical, social and emotional needs of the residents." Application, Part II "Project Description" at 2.

Homes and Rehab opposed the application and requested a public hearing. Diane C. Sartor, a planner within the Department's Division of Need Review, conducted a hearing during which Homes and Rehab stated the following objections: (1) Table 39–9 of the SHP indicates that 120 beds are not needed in Blair county; (2) Nittany's proposed facility will not serve its "fair share" of Medical Assistance patients; (3) there was a lack of proof that the project was financially feasible; and (4) Nittany's proposed facility will provide intensive rehabilitation services without a CON to specifically provide those services.

Sartor proposed the following finding:

1. The project is consistent with the Keystone Health Systems Plan and the [SHP].

2. The project meets the need for additional long term care beds in Blair County.

3. The project is financially and economically feasible.

Certified Record of Department of Health at 122. Sartor recommended approval of the application. The Secretary of Health adopted these findings and approved the CON.

Homes and Rehab separately appealed to the Board. The Board granted the Department's motion to consolidate the appeals. Homes and Rehab raised the following issues: (1) whether the Department's decision was supported by substantial evidence; (2) whether the Department violated constitutional, statutory, and regulatory law; and (3) whether the Department's decision was consistent with the SHP. Chairman George S. Webster conducted two days of hearings and received testimony from 12 witnesses. The Board was required by 37 Pa.Code § 197.45:

[T]o limit its review to the following issues:

(1) Whether the decision of the Department is supported by substantial evidence.

(2) Whether there was a violation of constitutional or statutory law or regulations of the Department.

(3) Whether there was any prejudicial procedural error committed during the review.

The Board concluded that the Department's decision was supported by substantial evidence, consistent with statutory law and the regulations, and contained no prejudicial procedural error. Accordingly, the Board affirmed.

Homes and Rehab separately petitioned for reconsideration by the Board. The Board denied both petitions.

Homes and Rehab separately appeal to this court the Board's order affirming the Department's decision. Homes and Rehab also separately appeal to this court the Board's decision denying their petitions for reconsideration. We have consolidated all the appeals.

■ On appeal,[8] Homes and Rehab (collectively, Petitioners) raise the following issues: (1) whether the Department improperly decided that there was a need for the proposed 120 nursing care beds; (2) whether substantial evidence supports the Department's finding that Nittany will not be operating as a rehabilitation hospital; (3) whether substantial evidence supports the Department's finding that Nittany's project is financially feasible; (4) whether substantial evidence supports the Department's finding that Nittany's project contributes to the needs of the medically underserved; and (5) whether the Board properly denied reconsideration.

## NEED REVIEW ISSUES

We initially note that Chapter 39 of the SHP contains "Table 39–9," which sets forth the nursing home bed need projections of the HSP. At the time Nittany filed its application, the most recent Table 39–9 expired in 1987 and indicated a need for 22 beds in Blair county. Table 39–9 was updated in 1989 by publication of CON memorandum 89–24,[9] 25 days before the Secretary of the Department approved the CON. The 1989 Table 39–9 indicated that Blair county had a surplus of 20 beds. CON memorandum 89–24 also contained a provision that "[i]n counties where the average occupancy rate of all existing nursing homes exceeds 95%, the Department may approve additional beds to relieve overcrowding regardless of [the Table 39–9] projections" (95% occupancy provision).

**8.** The Board's scope of review was limited by the CON regulations making the Department the fact-finder for purposes of CON review. Neither the Act nor the CON regulations provide this court's scope of review for the instant type of appeal. Accordingly, our scope of review is provided by the Administrative Agency Law which states that this court must affirm the adjudication of a commonwealth agency unless necessary findings are not supported by substantial evidence, the adjudication is not in accordance with law, or constitutional rights are violated. 2 Pa.C.S. § 704. Because the Department is the fact-finder and because our scope of review includes the determination of whether findings are supported by evidence, the decision subject to our review is the decision of the Department.

**9.** Pennsylvania Bulletin, Vol. 19, No. 4, January 28, 1989, at 370–372.

■ Under the Act, the Department can approve a CON only if it is consistent with the SHP. 35 P.S. § 448.707(a). Petitioners contend that under the SHP, the Department can approve a CON only if Table 39–9 shows a need for additional beds. As support for this contention, Petitioners cite "Recommended Action 39.1.1.1," of the SHP,[10] which provides: "[t]he Department will use ... Table 39–9 to determine whether a need exists for CON applications which propose the construction of new nursing home beds." JRR at 290a.

Nittany and the Department (Respondents) assert that the SHP does not mandate the exclusive use of Table 39–9 to determine need. We note that Chapter 39 of the SHP, which contains Table 39–9, does not state that Table 39–9 must be used to determine need. Petitioners' reliance on "Recommended Action 39.1.1.1" is misplaced for three reasons: (1) the provision is only a "recommended action" which by its very title is not obligatory; (2) the provision is only directive because it states only that the Department "will" use Table 39–9 and does not use the mandatory term "must" or "shall"; and (3) the provision does not prohibit the Department from using other information to determine need.

■ Petitioners also contend that the need review was improper because the finding of need was based entirely on the 95% occupancy provision in CON memorandum 89–24. Petitioners assert that the use of occupancy rates as a standard for determining need was a substantive change to need review under the SHP and had to be incorporated by formal amendment. It is undisputed that CON memorandum 89–24 was not formally adopted as an amendment to the SHP. Petitioners contend that because the finding of need was improperly based on occupancy, and because Table 39–9 showed no need, the CON should have been denied based on lack of need.

**10.** Recommended Action 39.1.1.1 is contained in· a comprehensive SHP, which was published in 1982 (1982 SHP).

The Department contends that the 95% occupancy provision in CON 89–24 was merely a clarification of recommendations in the 1982 SHP that occupancy rates be considered during need review. JRR at 292a. The Department states that it compares projected need with occupancy rates as a "reality check" to insure that it has an accurate assessment of community need.

To benefit from the expertise of the Department, it must be given the latitude to use the accumulated experience of its employees and officers. *See Rehab Hospital Services Corporation v. Health Systems Agency of Southwestern Pennsylvania,* 82 Pa.Commonwealth Ct. 147, 475 A.2d 883 (1984). This court will not second guess the Department's need review standards where those standards are arguably provided in the SHP. The 1982 SHP does state that occupancy rates are a factor to be considered when determining whether a sufficient number of beds are available. JRR at 292a. We hold that the Department's use of the 95% occupancy provision was proper.

■ Even under the 95% occupancy provision, Homes argue that there is no need for beds in Blair county. Homes assert that need exists pursuant to the 95% provision only where *each* nursing home in a county has 95% of its beds full. It is undisputed that only 7 of the 9 nursing homes in Blair county have at least 95% of their beds full.

The 95% occupancy provision states that the Department may approve a CON where "the *average* occupancy rate of all existing nursing homes exceeds 95%." (Emphasis added.) Under this provision, a finding of need is proper, where existing homes on the average have a 95% occupancy, even if some homes have less than a 95% occupancy. It is undisputed that the average occupancy rate of existing homes in Blair county was 95%. We conclude that the Department correctly applied the 95% occupancy provision.

## REHABILITATION SERVICES ISSUE

■ Of the 120 beds proposed by Nittany, 60 will be for intermediate nursing care and 60 will be for skilled nursing

care. Skilled nursing care includes some rehabilitation services. December 1986 Amendment to the SHP, JRR at 302a. The distinction between rehabilitation services provided at skilled nursing homes and intensive rehabilitation services provided at rehabilitation hospitals is the "intensity of service: therapy sessions are less frequent, usually one to two hours a day, three to five days a week; physician contact is less frequent, usually once a week, review by the treatment team is less frequent, usually monthly instead of weekly." *Id.*

Homes assert that Nittany proposes to operate an intensive rehabilitation facility and not a nursing home. Homes argue that the Department erred by not investigating the types of rehabilitation services Nittany proposed to provide. Specifically, Homes contend that the Department should have investigated the admission criteria, discharge criteria, hours of therapy, and number of weekly sessions Nittany planned to provide to decide if the proposed services constituted intensive rehabilitation services. Homes argue that because of the alleged failure to investigate, there is no evidence to support the Department's finding that Nittany proposes to provide only those rehabilitation services which are permitted at skilled nursing facilities.

The record before the Department contains a memorandum of Nittany responding to the contention that it intended to provide intensive rehabilitation services. This memorandum states:

"Intensive rehabilitation services["] provided in the nursing-home setting are not comparable to the "intensive-rehabilitation services" provided in the rehabilitation hospital. The nursing-home program is designed to meet the needs of the severely debilitated geriatric patient combining therapeutic rehabilitation services with skilled nursing care. Experience indicates that the patient served in the nursing home is not a candidate for the rehabilitation hospital due to their inability either physically and/or mentally to participate in the intensive rehabilitation hospital program. . . .

It should be noted that many Medicare-patient stays are short term requiring only strengthening, supervision and/or skilled observation. Those requiring a longer stay, while they may be receiving physical, speech or occupational therapy, are just as likely to be receiving benefits for one or more of the following services:
Tube feeding
Hyperalimentation
Central line
IV therapy
Decubitus care
Pain management
Bowel/bladder training
Patient/family teaching
Certified Record of Department at 81. The memorandum contains Nittany's statement that it has no intention of providing services provided by rehabilitation hospitals.

Generally, the type of investigation proposed by Homes could discover no more than a CON applicant's intent. Nittany has fully stated its intent, describing in detail the type of services it will provide, and disavowing any intention to compete with existing intensive rehabilitation care facilities. We conclude that the Department properly relied on these statements to decide that Nittany's proposed level of rehabilitation services was permissible at a skilled nursing facility.

## FINANCIAL FEASIBILITY ISSUE

■ Nittany's feasibility study is based on the assumption that 30% of its patients will have their services paid by Medicare. A high percentage of Medicare patients is financially significant because more revenue can be generated per Medicare patient than can be generated per Medical Assistance patient. It is not disputed that if substantially less than 30% of Nittany's patients are Medicare patients, its project is not financially feasible. In support of its assumption that 30% of its patients will be Medicare pa-

tients, Nittany offered evidence that it maintains 30% Medicare patient levels at other nursing homes it operates.

Homes contend that evidence as to Nittany's other nursing homes is irrelevant because those nursing homes are not in Blair county and Nittany presented no evidence that the other counties are similar to Blair county. In the absence of a comparison, Homes assert that the Department's reliance on Nittany's past experience was unreasonable in light of the evidence Homes presented. Homes' evidence consists of uncontradicted statements that the existing Blair county nursing homes have only 2–5% Medicare patients.

Nittany asserts that it operates nursing homes with 30% or more Medicare patients by constructing its facilities near hospitals and providing rehabilitative services not provided at other nursing home facilities. Nittany contends that the percentage of Medicare patients at existing nursing homes in Blair county is irrelevant to the percentage it anticipates achieving.

Homes provide no legal basis for its argument that the Department cannot consider Nittany's past nursing home experience because it gained that experience outside Blair county. Nittany provided evidence as to how it would apply its past experience to generate a higher Medicare patient percentage than other nursing homes in Blair county. The Department acted within its discretionary authority when it accepted Nittany's evidence as to its projected percentage of Medicare patients. Accordingly, we conclude that Homes' challenge to the Department's finding of financial feasibility fails.

### MEDICALLY UNDERSERVED ISSUE

■ Section 707(a)(19) of the Act, 35 P.S. § 448.707(a)(19) requires the Department to consider whether an applicant for a CON will contribute to the needs of medically underserved groups. Homes contend that the medically underserved group in this proceeding is Medical Assistance patients, and that the Department decision is invalid because

there is no finding as to Nittany's contribution to medically underserved groups.

In the findings attached to its decision, the Department stated that 30% of Nittany's patients would be Medical Assistance patients. Section 707(a)(19) does not set a minimum percentage of Medical Assistance patients a nursing home must serve. We conclude that once the Department fulfills its statutory obligation of considering a proposed facility's contribution to medically underserved groups, it is within the Department's discretionary authority to decide if the extent of this contribution is sufficient.

## RECONSIDERATION ISSUE

Petitioners assert that in their appeal to the Board they raised the following issue: whether the Department improperly applied the 95% occupancy provision of the CON 89–24 because, five days before approving Nittany's CON, the Department approved a CON for 60 additional beds in Blair county. Petitioners contend that the Board failed to address this issue and that they each petitioned the Board for reconsideration based on this issue. Petitioners assert that the Board abused its discretion by denying reconsideration.

The decision to grant or deny a request for reconsideration is a matter of administrative discretion and, therefore, will be reserved only for an abuse of discretion. *Ramsey v. Pennsylvania Milk Marketing Board*, 132 Pa.Commonwealth Ct. 74, 572 A.2d 21 (1990). An abuse of discretion is not merely an error of judgment. *Id.* It is a judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by evidence of record. *Id.*

That the Board did not discuss one of the many issues raised in Petitioners' appeals does not support Petitioners' contention that the issue was not considered. Regardless, the clear language of the 95% occupancy provision states that a CON may be approved "where the average occupancy rate of all existing nursing homes exceeds 95%," indicat-

ing that only *existing beds* are to be counted. The 60 beds were obviously not part of an existing home when Nittany's CON was approved. We conclude that the Board did not abuse its discretion.

Accordingly, the decision of the Department to approve Nittany's CON and the decisions of the Board to deny reconsideration are affirmed.

## ORDER

AND NOW, June 17, 1991, the order of the State Health Facility Hearing Board affirming the decision of the Department of Health in the above-captioned matter is affirmed. The order of the State Health Facility Hearing Board denying reconsideration is also affirmed.